AMERICAN PNEUMATIC TOOL CO. v. BIGELOW CO.

(Circuit Court, D. Connecticut. November 9, 1899.)

No. 876.

1. PATENTS—INFRINGEMENT—PNEUMATIC DRILLING TOOLS.
　　The Bates patent, No. 364,081, for a pneumatic drilling tool, claim 3, construed, and, as limited by the prior art, *held* not infringed by a tool made in accordance with the Boyer patent, No. 549,102.
2. SAME—SUIT FOR INFRINGEMENT—EQUITIES.
　　That a complainant brought suit against a defendant, who was a mere user of a single tool, alleged to infringe, instead of against the manufacturer, who had made and sold for use from 2,500 to 3,000, may properly be considered, in a doubtful case, as raising a presumption against the equities asserted by complainant.

This was a suit in equity for infringement of a patent. On final hearing.

Kerr, Page & Cooper, for complainant.
Edward Rector, for defendant.

TOWNSEND, District Judge. Final hearing on bill and answer presenting question of infringement of the third claim of complainant's patent, No. 364,081, granted May 31, 1887, to A. J. Bates. This claim has already been considered, and its validity sustained by the circuit court and the court of appeals in this circuit, in a suit by this complainant against Fisher (69 Fed. 331, and 18 C. C. A. 235, 71 Fed. 523). In the case at bar, the circuit court, without filing an opinion, ordered a preliminary injunction, which order was reversed on appeal. 23 C. C. A. 603, 77 Fed. 988. In view of said decisions establishing the validity of said claim, it is unnecessary to discuss the construction of the patented device, or of the alleged anticipating or infringing devices, except in so far as they bear upon the single question of infringement.

The court of appeals found in this case that certain minor differences of construction between the complainant's and defendant's

tools were immaterial, but that a serious question respecting infringement depended upon the construction to be given to the word "controlling" in the claim in suit, and they left the respective theories of the parties to be "subjected to the test of more stringent investigation than can be made by affidavits." Since this decision, complainant has taken the deposition of its expert, Dr. Benjamin, and defendant has taken depositions and filed exhibits which altogether cover 750 pages of record.

The Bates Tool.

In the consideration of this case, only those patents will be ·discussed which were not before the court in the Fisher Case.  As explained in said opinions, the tools under discussion belong to the class known as "pneumatic drilling tools," wherein a hammer is operated by compressed air by means of valves controlling a series of ports.  Complainant's patent covered such a drilling tool, comprising inter alia, a cylinder having a central chamber extending longitudinally into it from its bottom, and through which a piston operated vertically to strike rapid blows against the cutting tool, and across the upper portion of said cylinder a transversely operating valve for controlling the operation of said piston by regulating the admission of air through certain ports or passages.  In order to understand the issues herein, and the valve and piston movements of the tool of the patent in suit, it will be necessary to refer to the drawings thereof.

Live-air chamber, R, receives air from the pipe, P″, by means of groove, m, port, v, passage, v′, and port, v². See Fig. 5. It supplies live air to the right end of the valve chamber by port, w′, and passage, w; and to the left end of the valve chamber by port, d′, and passage, d. Fig. 4. Exhaust chamber, R′, receives the exhaust air from the right end of the valve chamber by passage, w, and port, w², and from the left end of the valve chamber by passage, d, and port, d². It is always open to exhaust port, G′, by port, z, passage, z′, and passage, G. Air is admitted above the piston by means of the chamber, F′, in the valve and the port, I, and below the piston by chamber, F, port, g, passage, g′, and port, g². Air is exhausted from above the piston by means of the port, I, chamber, F′, port, o, passage, o′, passage, G, to the exhaust port, G′. It is exhausted from below the piston by means of port, g², passage, g′, port, g, chamber, F, port, a, passage, a′, passage, G, to exhaust port, G′. The valve and piston are each provided with two annular chambers. The upper chamber, R, of the piston, is in constant communication with compressed or live air; the lower, R′, is constantly open to the atmosphere. The movements of the valve serve to cause the reciprocating movements of the piston by putting the opposing ends of the piston chamber alternately in communication with said supply and exhaust, and the movements of the piston thus cause the reciprocations of the valve. At the left end of the valve chamber is a passage, d, which opens at its lower end into the piston chamber by ports, d′ and d². Similar passages, and ports, W, W′, and W², at the right end of said valve chamber, are similarly located and connected. When the piston is in its lower position, the passage, d, is in communication with the live-air chamber, R, while the passage, W, is in communication with the exhaust-air chamber, R′. The effect of such pressure and exhaust on opposite ends of the valve is to shift the valve to the right, and thereby cause the piston to rise, to close passage, d, to R, and open it through port, d², to the exhaust chamber, R′, and to close passage, W, to R′, and to open it through W′ to the live-air chamber, R, and thus again to shift the valve. This valve controls the operation of the piston through port, I, which admits air above the piston, and ports

and passages, g, g′, and g², which admit air below the piston, placing them alternately in communication with the live air and exhaust. The chamber, R, of the piston receives live air from the pipe, P″, by means of groove, m, port, v, and passage, v′, and port, v². Thence it passes by port, W′, to the right end of the valve chamber, and by port, d′, and passage, d, to the left end of said chamber. The chamber, R′, receives the exhaust air from the right end of the valve chamber by passage, w, and port, w², and from its left end by passage, d, and port, d², and is always open to exhaust port, G′. When the valve is at the extreme left of its transverse movement, it permits the live air to pass around its chamber, F′, and down through the port, I, above the piston, while the exhaust air below the piston is open to said exhaust port, G′, by port, g², passage, g′, port, g, around chamber, F, through port, a, passage, a′, and passage, G. The piston will therefore be driven downward, and the passage, d, being open to live air, R, and W to exhaust air, R′, the valve will be again shifted to the right, admitting live air through the ports and passages leading to the lower end of the piston chamber, and permitting the exhaust air to pass out from above the piston through port, I. The claim in suit is as follows:

"In the pneumatic drilling tool described, and in combination with the case having an inlet and exhaust port, the cylinder, D, having a piston chamber and a valve chamber arranged separate from each other, and connected by means of ports and air passages, the piston, B, and valve, J, for controlling said piston through the medium of said ports and air passages, substantially as and for the purpose set forth."

The vital element of said claim, so far as concerns the issues herein, is the "valve, J, for controlling said piston," etc. The essential element of organization for the purpose of exercising this control, and the method in which it is exercised, is stated in the specification as follows:

"It is not absolutely necessary that the valve, J, should be located in the precise locality shown, only so it is separate from the piston, B, and operates to admit air at either end of the cylinder, as set forth. All the ports and channels which feed live air to the different ports of the tool communicate with the valve chamber, D′, and by the action of the valve, J, the proper ports are alternately opened and closed, or alternately opened to the live-air chamber and to the exhaust ports, for the purpose of reciprocating said valve and the piston, B. * * * The ports which alternately admit compressed air to the upper and lower end of said piston are also brought into service as exhaust ports, acting as feed and exhaust ports in an alternate manner."

The court of appeals, in construing these statements, held that the word "either," in the foregoing paragraph, meant "each," and that said statement "seems to assert that the valve must have, as its appropriate function, the admission of air at the forward end of the piston chamber."

The alleged infringing tool is made by Joseph Boyer, of St. Louis, in accordance with the specifications of his patent, No. 549,102, granted November 5, 1895. The operation of said tool is so clearly and accurately stated by counsel for defendant that his language will be quoted later. For that reason the lettering used in his

drawings will be used in describing the construction of the device, which construction, so far as is essential for discussion of the relation of valve and piston, is as follows:

Two piston chambers, T and U, of different diameters, are fitted with a piston, the head of which corresponds to the upper larger diameter, and the stem to the lower smaller diameter, said stem having a shallow groove, X. Live air is admitted from the main inlet passage, G, directly into the lower end of said chamber, below said piston, by means of port, Y, passage, Y'. Above the piston chamber is a valve chamber containing a differential valve, J, on whose left hand and smaller pressure area live air is constantly admitted from said main inlet passage, G. Live air is intermittently admitted to the right-hand larger pressure area, past the spring check valve, O, in the chamber, N, through a port, Q, and passage,

P, controlled by the piston. The lower end of said valve chamber is connected with the upper end of the piston chamber by means of the passage, L, which, by the reciprocations of said valve, is alternately placed in communication with said main inlet, G, and an exhaust, K. The main valve chamber at the left of the check valve is connected by means of the passage, R, with the upper larger piston chamber, through port, A', and with the lower smaller portion, through port, S.

The mode of operation of said tool, as described by counsel for defendant, is as follows:

"Starting with the piston and valve in the position shown in Fig. 2. In such position, the port, L, connecting the valve chamber with the rear end of the piston chamber, is in communication around the contracted middle portion or waist of the valve, J, with the main inlet passage, G, while the front end of the large piston chamber, T, is in communication with the exhaust through the port, A', passage, R, and port, S, opening into the front end of the smaller piston chamber, U, which latter is always in communication with the atmosphere through a large hole in the cylinder wall immediately in rear of the chiseled sleeve or bushing, U'. The piston will therefore be driven forward by the pressure of the motive fluid behind it. As the piston approaches the forward end of its stroke, the front end of its stem, V, will pass over and close the port, S, at the front end of the long passage, R, leading backward to the valve chamber, while the rear end of the. head, W, of the piston, will pass forward of and uncover the port, Q, at the front end of the passage, P, which leads backward to the upper end of the valve chamber. The result will be that the motive fluid from the chamber, T, behind the piston, will pass backward through the passage, P, to the upper end of the valve chamber, and pressing downward upon the check valve, O, will force it from its seat, and pass by it, and act upon the superior area of the upper end of the main valve, J, thereby forcing the latter downward to the position shown in figures 1 and 3, in which position the port, L, at the rear end of the piston chamber, will be in communication, around the middle contracted portion of the valve, with the exhaust passage, K, while its communication with the inlet passage, G, will be cut off by the flanged upper end of the valve. The pressure behind the piston, which has been driving it forward, will therefore instantly escape backward through the port, L, and exhaust passage, K, but the piston will continue its forward movement under the momentum which has been imparted to it. At about the same time that the rear end of the piston uncovers the port, Q, and causes the shifting of the valve, J, just explained, the front end of the groove, X, in the piston stem, V, will come opposite and uncover the port, Y', thereby placing said passage in communication with the front end of the large piston chamber, T, through the port, Y, and the space around the contracted portion, X, of the piston. As has heretofore been pointed out, the passage, Y, is in constant open communication with the main inlet, G, of the tool (see dotted lines in Fig. 1 of the foregoing cuts), so that said passage is constantly filled with the motive fluid when the tool is in operation. As soon, therefore, as it has been placed in communication with the front end of the large piston chamber, in the manner just stated, the motive fluid will pass into said chamber, and exert its pressure against the annular forward side of the piston head, W, tending to arrest the forward movement of the piston, and drive it backward; but the momentum of the piston will carry it on forward to the position shown in Fig. 1, and cause it to strike the inner end of the tool shank. The cutting or working end of the tool, Z, being in contact with the surface of the work being acted upon, it cannot be driven forward any appreciable distance, and the contact of the front end of the piston with the inner end of the tool shank will therefore arrest the forward movement of the piston, and cause it to rebound and start backward. Such backward movement is aided for a very short distance by the motive fluid admitted to the front end of the large piston chamber from the live-air port and passage, Y, Y', as above de-

scribed, but very early in the backward movement of the piston this supply is cut off by the stem, V, of the piston overriding and closing port, Y, and at about the same time the piston head, W, will pass rearward of and uncover the port, A', while the front end of the piston stem, V, will likewise pass rearward of and uncover the port, S; thereby placing the front end of the large piston chamber in communication with the exhaust through the port, A', and passage, R, and port, S. Thus, as the piston approaches the forward end of its stroke, it uncovers a live-air port, and admits the motive fluid to the front end of the piston chamber, and at the same point in its backward movement closes said port, and cuts off the supply of motive fluid, and at the same time opens an exhaust port communicating with the front end of the piston chamber. The motive fluid is thus admitted in front of the piston for an instant, at the front end of its forward stroke, and is then exhausted, both the admission and the exhaust being through ports opened and closed by the stem of the piston itself."

When the piston is at the upper or rear end of the chamber, the main inlet live-air passage, G, is open through the port, L, to the rear or upper end of the head of the piston, and the exhaust port, S, is open to the atmosphere. The piston, being driven downward, covers said port, S, and uncovers said port, Q, which leads up to the right-hand chamber and check valve, thereby opening said check valve, and driving the main valve, J, to the left, so as to close L to live air, and open it to the exhaust, K; and the grooved portion of the stem of said piston passing down opposite the port, Y, at the left, opens it to the constant live-air inlet, Y'. The air, passing thus in under the head of the piston, tends to drive it upward, and, after a cushion operation as the piston passes upward, it closes said port, Y, and the lower end of the stem, V, uncovers the exhaust port, S, which is in communication by passage, R, with the trapped air pressure against the valve, J; thereby releasing said pressure, and permitting the constant air pressure on the left of said valve to throw it back to its original position. The main valve in each tool directly controls the downward movement of the piston through the medium of the ports and passages described. In complainant's tool the main valve also thus directly controls the upward movement of the piston. In defendant's tool the inlet and exhaust passage below the piston do not communicate with the valve at all, but are directly opened and closed by the movement of the piston. The patentee says it is essential to his claimed construction of valve that it "operates to admit air at either end of the cylinder, as set forth." The complainant contends that this statement shows that the patentee refers, not to the structure, but to the result of the operation of the valve, and that "the requirements of the specification are that the valve, by reason of its operation acting directly or indirectly, shall control the admission of air, or, what is the same thing, effect alternately a differentiation in air pressure at opposite ends of the piston chamber." The mechanical fact is that the valve in defendant's tool operates to admit and exhaust air at the upper side only of the piston, and by this means, in this sense, indirectly controls the movement of the piston. Counsel for defendant says:

"It is likewise essential to downward movement of the piston that the exhaust port below the piston shall be opened, and in defendant's tool such exhaust port is opened by the piston itself at its upward stroke. Moreover, it

is just as essential to the up stroke of the piston that the exhaust port below the piston be closed as that the inlet port be opened, and such exhaust port is closed in defendant's tool by the stem of the piston itself, and not by the valve. If, therefore, the control of the exhaust at a given end of the piston chamber is to be considered the controlling factor, defendant's valve does not control the downward movement of the piston, for such downward movement could not be effectively produced if the piston itself had not previously opened the exhaust port for the lower end of the piston chamber; and it does not control the upward movement of the piston, for such movement could not be produced without closing the exhaust port below the piston, and this is closed by the piston itself."

The complainant's theory of its patent is stated by its expert as follows:

"In the device described in complainant's patent in suit, the feature of differentiation over prior pneumatic tools consisted in placing the valve in a separate chamber in the upper end of the cylinder, instead of placing it in a chamber in the piston. The essential feature of novelty, of the Bates invention (as set forth in claim 3 of the patent) consists in the arrangement of the valve and piston of a pneumatic tool in separate chambers in the same inclosing cylinder, as distinguished from their arrangement in the same chamber, as where the piston carries the valve."

This patent is for a pneumatic drilling tool. Defendant has introduced a great number of patents, not before the court in any of the former cases, which show that such a location of valve was old. It is only necessary to refer to one, the Darlington British patent, No. 3,664, which shows a pneumatic drilling apparatus having its valve chamber in the precise location shown in Bates, and connected, as in Bates, through ports and passages with the live air and exhaust. Complainant's expert practically admits that this Darlington apparatus is substantially identical with that of complainant, except that in Darlington the tool is connected with, while in Bates it is disconnected from, the piston. But the prior Sergeant patents, Nos. 295,682, 308,524, and 308,525, show such cutting drills, both connected and disconnected, in a hand pneumatic drill substantially like the Bates tool. In the Fisher Case, the court, assuming upon the evidence then before it that Bates was an independent inventor of said improvements, said: "The third claim of the Bates patent describes an improvement upon its predecessor in a narrow, though important, particular," which improvement "consisted in placing the valve in a separate chamber in the upper end of the cylinder, instead of placing it in a chamber in the piston." The new evidence in this case overwhelmingly supports the finding that the said Bates improvement was a narrow one, and effectively disproves the claim that the limiting devices were inoperative or in a nonanalogous art.

In view of these facts, the patentee must be restricted to the construction described in his specification and claim of a separate valve controlling the piston at each end of the cylinder, as set forth. The third claim is not infringed by a construction in which the valve is entirely disconnected from the lower end of the piston chamber, and in which the piston independently opens and closes the inlet and exhaust at its lower end, and in which such operation by the piston is absolutely essential to the control both of the upward

and downward movement. This conclusion dispenses with the necessity of a consideration of the great utility and commercial success of the Boyer tool, or of its meritorious contributions furnished to the art, including its ingenious arrangement of parts for cushioning the blow, or its devices for permitting the tool to be held in contact with the object to be worked on, or for causing a cessation of operation when not in use. Nor is it necessary to consider the evidence that the tool of the patent in suit is one of limited scope, never having been made or sold until after the introduction of defendant's tool, or the claim that complainant's narrow invention, having now been shown not to consist in the separate chamber, was really for a novel method of construction, whereby it might be more readily maintained in operative condition, and for certain other supplemental features of construction which provide means for regulating the operation of the striker and drill.

There is one element, however, which should not be overlooked in this case. The defendant uses one only of these tools, and uses it exclusively for calking boilers and beading flues. The manufacturer of defendant's tools is located in another circuit, and has manufactured and sold some 2,500 or 3,000 of these tools, practically all of which are now in use. The defendant, as already stated, is the mere user of a single tool. After the preliminary injunction was granted, complainant sent a circular to manufacturers, claiming $1,848,000 as the amount it would be entitled to receive from infringers. No reason is shown or suggested why this suit was not brought against the real substantial defendant. If this were a doubtful case, I think a court might well consider whether such a course might not properly raise a presumption against the equities asserted by complainant. Let the bill be dismissed.