CLEVELAND PNEUMATIC TOOL CO. v. CHICAGO PNEUMATIC
TOOL CO.

(Circuit Court, E. D. Pennsylvania. July 11, 1908.)

No. 14, April Sessions 1904.

PATENTS—INVENTION—PNEUMATIC TOOL.

The Richards patent, No. 665,033, for a pneumatic tool, the only claim-
ed novel feature of which is a permanently open live air port for ad-
mitting air to the rear of the piston to act as a cushion and reduce the
jar, and to aid in starting the same, is void for lack of utility as well as
invention, in view of the prior art; also *held* not infringed, if conceded
validity, in view of its narrow scope.

In Equity. Suit for infringement of letters patent No. 665,033, for
a pneumatic tool, issued January 1, 1901, to C. B. Richards. On final
hearing.

E. Hayward Fairbanks, for complainants.
Samuel E. Hibben and Frank P. Prichard, for defendants.

ARCHBALD, District Judge. The patent in suit is for a pneu-
matic tool; the controversy being over that feature of it, by which,
through a permanently open port or supply duct, live air is admitted
to the rear of the piston or plunger cylinder, and the claims which
cover it being given in the margin.[1] The advantage claimed for this,
in the specifications, is that "at the end of the back stroke the plunger
will be cushioned by the live air entering the rear end of the plunger
cylinder through the permanently open shallow channel" thereby pro-
vided, thus reducing the jar experienced in the use of tools of this
character, which at the best is racking, and also preventing the piston
or plunger from striking against the end of the piston chamber or
valve block. It is also now further claimed to furnish an initial im-
pulse in starting the plunger forward, so that it shall respond on the
instant to the action of the motive fluid, which is of especial impor-
tance when the tool is held vertically, as in overhead riveting. But
nothing of that kind is suggested in the patent, and is conceded by
the inventor to be an afterthought. The defendants, in the tool which
they put out, make use of a permanent live air port, such as is so
specified; but it is differently located, opening into the rear of the
piston chamber back of the control valve, through which the plunger
reciprocates, instead of immediately back of the plunger, and is not

[1] "20. In a pneumatic tool, the combination with a plunger-cylinder pro-
vided with air inlet and exhaust at its rear end and with a small duct at
said end for permanent admission of live air, of a plunger reciprocating in
said cylinder, and means for returning said plunger to and against the air-
cushion provided through said permanent air-supply duct, substantially as
set forth.

"22. In a pneumatic tool, the combination of a plunger-cylinder having an
inlet and exhaust port at each end and means for distributing the air to and
from said ends and formed with a permanently open live air inlet port of
small area at the inner end of its bore, and a plunger reciprocating in said
cylinder and cushioned at its back stroke by the air admitted through said
last-mentioned port, substantially as set forth."

intended to cushion or relieve the back stroke, as it is said, but purely and solely to start the tool quickly, the cushioning of the plunger being otherwise provided for, by means of the live air trapped in the rear of it.

The utility of the complainants' device for the purpose designated is challenged, and is exceedingly doubtful under the showing made. The permanently open live air port, which is its feature, is declared by the inventor in a later patent to be unessential, although desirable to expedite the shifting of the valve, and is entirely omitted in a still later one, as it is in the one taken out by Secher & Greve in the complainants' interest. By the experiments, also, which were put in

evidence, it is established, as the complainants themselves in the end were compelled to admit, that, as a means to prevent the plunger from striking the end of the piston chamber or valve block the device is useless; the alternative advantage being thereupon claimed for it as a piston starter. Nor have the complainants themselves shown any great faith in its efficiency by the use which they have made of it. For, while it is true that they manufactured in accordance with the patent for a time, it was only for a few months, only 100 or 200 tools being made, of which but 50 were sold; the rest being broken up and consigned to the scrap heap. In the style of hammer, moreover, which they have put out since some time in January or February, 1900, the restricted live air inlets which they employ are not permanently—that is to say, at all times—open, but only on the back stroke of the piston, when a cushioning effect is desired, thus dispensing with the most distinctive feature of the device, as well as the one absolutely essential to make out infringement. Nor, upon principle, is it easy to see how the leak port of the patent can be effective for any purpose, located as it is in immediate proximity to the rear inlet and exhaust port, which is open for exhaust, and through which it must therefore waste at the very time when it is supposed to afford a cushioning resistance. It is said that there is a point during the back stroke, when the exhaust is cut off and before the live air is readmitted, when the leak port has a chance to operate. But this, if true, is so infinitesimal as to be practically ineffective.

But, assuming that a small, permanently open, live air inlet, at the rear of the piston chamber, may possibly serve, to a certain degree, to cushion or relieve the jarring of the plunger, and so be of sufficient utility to be considered, there would seem, even so, to be nothing patentably inventive, in a device of that kind, over others of like character already to be found in the prior art. Those devices may be laid aside, in discussing this, which provide for cushioning the plunger solely by trapping and compressing the motive fluid in the rear of the piston chamber, or in a recess or pocket back of that, except as they serve to show the use of such fluid for cushioning purposes, in one form or another, in reciprocating tools, to be common. But, on the other hand, no distinction is to be made by reason of the different motive force employed, whether steam or air; nor the size or particular use to which such tools are put, whether hand-held, for chipping, riveting, or hammering, or mounted on tripods or wheels, for rock drilling or quarrying, the structure and mode of operation in all being substantially alike. American Pneumatic Tool Co. v. Bigelow Co. (C. C.) 100 Fed. 467; American Pneumatic Tool Co. v. Philadelphia Pneumatic Tool Co. (C. C.) 123 Fed. 891.

Thus in the Sypher (1886) steam drill—in which, by the way, the use of compressed air is also recognized—at the rear of the piston chamber not only is there a pocket where the steam is confined, by which the piston is cushioned on its back stroke, but in addition there are restricted ports for admitting live steam into the same, for the same purpose, as well as to start the piston forward from its extreme rearward position. The distinction is made, as to these restricted ports, that they are intermittently and not permanently open, being

controlled by a spring check-valve, which closes when the density of the steam in the cushioning space exceeds that of the boiler pressure. But that does not do away with the effect of the use which is so disclosed of ports of this character to admit the motive fluid, both to form a cushion and to start forward the piston, the particular functions claimed for the device of the patent. These ports, moreover, are open so long as they are functionally useful, corresponding in this respect to the modified form to be found in the style of hammer at present put out by the complainants.

The same is to be said of the two subsequent Syphers, improvements on the first, in each of which, while the piston is principally cushioned on the steam trapped or locked in the rear of the piston chamber by the closing by the piston of the supply and exhaust inlets, a restricted amount of live motive fluid is admitted into such cushioning space, by small inlet or leak ports additionally provided for the purpose, as it is said, of starting or lifting the piston in overhead work, and also, as declared in the one, of assisting to cushion it; the cushioning effect, whether claimed or not, necessarily existing in both, if it does in the device in suit. Here, too, no doubt, the leak ports are not at all times open; but they are when they are of any efficiency, which would seem to be all that is required. It may be noted in passing, with regard to the last (1892) Sypher, that in the location and function of this port it is closer to the defendants' device than is that to the device of the patent.

In the Richmann (1880) rock drill, also, after the piston in its backward movement has closed the rear exhaust, the air back of it is trapped to form a cushion; a small live air port, leading into this part of the piston chamber, being closed by the outward pressure of the air against a plate valve, and, on the shifting of the control valve, admitting live air again to the rear of the piston, so as to start it forward, until taken up by the motive air supply coming in through the regular channels.

The Allen (1877) pneumatic hammer also provides for cushioning the piston by trapping the air at the rear of the piston chamber; a small live air port leading to it (which is closed for the time by a flap valve, so as not to waste the effect) admitting the motive fluid again to the rear of the piston, to start it forward.

In the Ross (British, 1898) hammer there is also the same double provision for reducing the shock of the back stroke: First, by the compression of the air back of the piston, after it has closed the rear exhaust port; and, second, by the direct introduction of the actuating fluid, through a permanently open live air port, to a cavity or recess, provided for the purpose, in the rear of the piston chamber, and separated from it by a movable end plate or diaphragm, this plate being kept in forward position by the pressure of the motive fluid admitted through the port, but yielding, as required, to the compression by the piston of the air in the piston chamber.

Except as to trapping the air, the construction of the Harrison (1882) coal mining machine is quite similar. Here, the same as in the Ross, there is a disc or plate at the rear of the piston chamber, pressed normally into forward position by live air admitted back of

it through a small duct or port permanently open; this live air, in conjunction with the plate, forming a cushion to receive the impact of the piston.

So in the Wood (1873) rock drill, not only is the air trapped or compressed in the rear of the piston chamber, but, by means of a movable head closing it, a cavity is formed back of that, into which live air is admitted through a small port, for the purpose of still further cushioning the piston. This port is closed by a poppet valve against the escape of the motive fluid under the back pressure of the piston; but, the same as in the other cases mentioned above, it is opened whenever the admission of the fluid supply would be effective for cushioning purposes.

Again in the Boyer (1895–1897) chipping hammers the piston, after the shifting of the control valve, moves rearwardly against the resistance of an air cushion, formed by the live air admitted through small inlet ports thereby uncovered.

In the Boyer (1901) long stroke hammer, however, the cushioning is effected solely by trapping and compressing the air in the rear of the piston chamber. And so is it in the hammer manufactured under the Boyer application of September 26, 1899, which application, although filed over two months before that of the patent in suit, is still pending and undisposed of. In this latter style of hammer, however, not only does the piston trap and compress the air in the bushing which forms the rear of the piston chamber, both cushioning it and serving to start it forward, but a small leak port is also shown in the shell valve, through which the piston reciprocates, which admits live air about the piston in its rearward position, and thence, as it is claimed, by reason of its loose fit, to the rear of the piston chamber, both assisting to cushion the piston, as it is said, as well as to start it forward. But the purpose of this leak port is to admit live air to act upon and shift the valve, in advance and independently of that admitted through the rear main inlet, and the additional function which is claimed for it is, to say the least, doubtful. This style of hammer, moreover, was not devised until the summer of 1899, and while it is said to have been manufactured and put out the same year, which would make it a part of the prior art from that time on, regardless of the disposition of the pending application, the evidence leaves it uncertain from just when it is to be so taken, which does away with much of the effect of this. If considered, however, as established in the art, by such use, in the fall of 1899, prior to the application for the patent in suit, its significance, even so, consists solely in its showing a small leak port, of the same general character as that of the complainants' tool, for the purpose of admitting live air intermittently into the piston chamber, about the piston, but not directly, at least, in the rear of it; neither the cushioning nor the starting of the piston, by such means, being effectively disclosed.

Summing up the results of this review, it thus appears that in various reciprocating tools, operated by fluid motive force, long prior to the patent in suit, similar inlet or leak ports, in direct connection with the fluid supply, were extensively employed for the purpose of admitting such fluid to the rear of the piston or piston chamber, in

order to assist in cushioning the piston or lessening the shock or jar from it on its backward stroke, as well as to lift it or give it a quick forward start, either or both. It matters not, in view of this, whether the invention be confined to the cushioning function assigned to it in the patent (Computing Scale Co. v. Keystone Co. [C. C.] 88 Fed. 788, 101 Fed. 837, 42 C. C. A. 48; Whitaker Co. v. Huntington Co., 95 Fed. 471, 37 C. C. A. 151; Anthony Co. v. Gennert, 108 Fed. 396, 47 C. C. A. 426), or is allowed the further effect now claimed for it of securing a quick start. In either case it is met by a similar device, employed for the same purpose, already in the art; the only difference being the particular location given to it and its relation to some of the adjacent parts. The distinction sought to be made for it, that in no other instance is the port permanently open, admitting the motive supply uncontrolledly to the rear of the piston, taken strictly, may be true, laying ground for the contention that no direct anticipation of the device is thus shown. But the question is not so much whether it has been anticipated as whether it shows any inventive advance over what was already known and used, as to which it is obvious that it does not. The whole invention, as it is to be noted, resides simply in the particular location given to the leak port, and in leaving it open at all times to the fluid supply. But the distinction between a port of this character left permanently open and one intermittently so, particularly where the latter is open whenever it is capable of any effective function, amounts to but little on the question of invention. And the same is true of the location of the port, whether opening back of a disc or plate at the rear of the piston chamber, or into such chamber direct at the rear of the piston. With parts so closely identical, both in form and function, it clearly involved no invention, as it served no useful purpose, in making use of a small live air inlet, old in the art, to lead it into the piston chamber at the rear of the piston, dispensing with a check valve, and leaving it open at all times to the motive supply. The change so effected from that which had gone before consisted in nothing more than a shifting of the position of the port, giving it uninterrupted contact with the air supply, and making it directly operative on the parts involved; altogether too insignificant and inconsiderable a matter to be made the basis of any claim.

But, even assuming that there was possibly some small margin of invention in this rearrangement and adjustment of old parts, and that possession was thereby legitimately taken of an unoccupied portion of the inventive field, still the invention is necessarily a narrow one, being confined by existing devices to the particular arrangement shown, which the defendants have not appropriated, and do not, therefore, infringe. It may be that, taking the patent literally, this cannot be said; the claims being in terms fulfilled by the defendants' device. But that does not altogether control. The fact is, as already pointed out, that, located as the defendants' live air port is at the extreme rear of the piston chamber, and opening there into a pocket or recess in which the air is trapped, the device approaches much nearer to others already in use than it does to the one in suit. Differing from that of the patent, the function claimed for it is the starting of

the piston; the cushioning being otherwise provided for. And while the complainants may be entitled to whatever utility resides in their invention, and the appropriation of it is not to be disguised by assigning a different use, there is no ground for any charge of that kind here. Both cushioning and starting, by means of restricted live air inlets, located exactly like these, and in immediate contact with the motive supply, being old, the defendants had a perfect right to adopt, as they have, that which they thus found already at hand in the prior art. The only point of similarity outside of this, and the only possible ground of complaint, is that it was left permanently open, instead of being checked or controlled. But this, as the basis of a claim either of infringement or invention, is of too little consequence to be sustained.

The bill will be dismissed, with costs.