# CHICAGO PNEUMATIC TOOL CO. v. KELLER PNEUMATIC TOOL CO.
## (two cases).

(Circuit Court of Appeals, Third Circuit.    October 19, 1923.    Rehearing Denied January 10, 1924.)

Nos. 2966, 2961.

1. Patents ⬯21—Substitution of materials not ordinarily invention.

The adoption of substitute materials does not ordinarily rise to the dignity of invention.

2. Patents ⬯328—No. 730,887, claims 1, 2, and 3, for pneumatic hammer handle, held invalid.

Doughty patent, No. 730,887, claims 1, 2, and 3, relating to improvement in pneumatic hammer handle, consisting only of substitution of drop forgings for cast steel, *held* invalid for want of invention.

3. Patents ⬯328—No. 866,573, claims 2, 3, 5, and 9, for rivet-set clip invalid.

Boyer patent, No. 866,573 claims 2, 3, 5, and 9 for a rivet-set clip or nose clip, *held* invalid for want of invention.

4. Patents ⬯328—No. 917,242, claim 24, for exhaust deflector, held invalid.

Boyer patent No. 917,242, claim 24, for exhaust deflector for pneumatic hammers, *held* invalid.

5. Patents ⬯328—No. 917,242, claims 25, 26, and 27, for locking device for pneumatic hammers, invalid.

Boyer patent, No. 917,242, claims 25, 26, and 27, for locking device for pneumatic hammers, *held* invalid for want of invention.

6. Patents ⬯328—No. 822,146, claims 37 and 38, for pneumatic hammer valve, not infringed.

Meissner patent No. 822,146, claims 37 and 38, for valve movement in pneumatic hammer, *held* not infringed.

7. Patents ⬯328—No. 917,242, claims 21 and 22, for pneumatic hammer valve, not infringed.

Boyer patent No. 917,242, claims 21 and 22, for valve movement for pneumatic hammer, *held* not infringed.

8. Patents ⬯11—Not given for function resulting from operation.

A patent cannot be given for a function resulting from the operation of a mechanism but for the creating mechanism only, though the mechanism must be studied with regard to the claims made for it in order to establish invention.

9. Patents ⬯241—No infringement where mechanism used for purpose not contemplated.

A charge of infringement will not lie against one who, while mayhap using the identical mechanism, used it for a function altogether different from that contemplated and claimed in the patent.

10. Patents ⬯328—Meissner patent, No. 822,146, claim 21, not infringed.

Meissner patent, No. 822,146, claim 21, for infringing device for riveting mechanism, *held* not infringed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suits in equity by the Chicago Pneumatic Tool Company against the Keller Pneumatic Tool Company. From the decrees, both parties appeal. Reversed in part, and affirmed in part.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

S. E. Hibben, of Chicago, Ill., Ralph B. Evans, of Philadelphia, Pa., and Edward Rector, of Chicago, Ill., for plaintiff.

Fraley & Paul, of Philadelphia, Pa. (Frank B. Fox and Henry N. Paul, both of Philadelphia, Pa., of counsel), for defendant.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and RUNYON, District Judge.

RUNYON, District Judge. These cases have to do with improvements in pneumatic hammers, and concern an art which was introduced to the attention of this court many years ago, when the primary patents issued to Boyer, now long since expired, were the subject of consideration, and through other cases reported as hereafter noted. Since those early days, these tools have come into such extensive use, and have been the subject of such varied and successful improvements from time to time, as to make the present art a highly developed one, and with a consequent shrinkage in the scope of possible advance.

In the cases now before us there are four patents concerned; First, patent No. 730,887, granted to Doughty on June 16, 1903, for a blank for hammer handles; claims 1, 2, and 3 thereof being involved. These claims were held invalid by the court below, and the Chicago Company appeals. Second, patent No. 822,146, granted to Meissner on May 29, 1906, for a pneumatic hammer, and involving claims 21, 37, and 38. The court below held these claims valid, and the Keller Company appeals. Third, patent No. 866,573, granted to Boyer on September 17, 1907, for a pneumatic hammer, claims 2, 3, 5, and 9 of which are involved. These claims were held invalid, and the Chicago Company appeals. Fourth, patent No. 917,242, granted to Boyer on April 6, 1909, for a pneumatic hammer. Claims 21 and 22 were held to be valid and infringed, and from this finding the Keller Company appeals, while from a finding that claims 24, 25, 26, and 27 were invalid the Chicago Company appeals.

In order that repetition may be avoided, and that at the same time there may be gained a fair survey of the art in general, attention is called to a number of cases noted in the margin, [1] showing Boyer's connection with the development of the art to date back as far as 1883.

### Doughty Patent, No. 730,887, for Hammer Handle.

The earliest patent of the four under consideration is the patent issued to Doughty for a hammer handle. Before the appearance of Doughty's handle, Boyer himself had invented a handle for his pneumatic riveter, fashioned after the shape of a pistol end; the similarity leading to its being generally known as the "pistol grip" handle. Through the inside of this handle ran a channel or duct, and it was

---

[1] Third Circuit cases: Boyer v. Keller (C. C.) 110 Fed. 217; Boyer v. Keller, 127 Fed. 130, 62 C. C. A. 244; Cleveland Co. v. Chicago Co., 135 Fed. 783, 68 C. C. A. 485; Cleveland Co. v. Chicago Co. (C. C.) 154 Fed. 953; Cleveland Co. v. Chicago Co. (C. C.) 163 Fed. 846. Sixth Circuit cases: Boyer v. Cleveland Co. (C. C.) 171 Fed. 105; Boyer v. Cleveland Co., 185 Fed. 808, 108 C. C. A. 40.

through this duct that the air or motive fluid coursed in operating the riveter. This patent passed the tests, not only of the Patent Office, but of several courts called upon to weigh its merits. See 110 Fed. 217; 127 Fed. 130, 62 C. C. A. 244; 135 Fed. 783, 68 C. C. A. 485; 154 Fed. 953.

These pistol grip handles were made of cast steel, molding forms being used for the securing of the shape, and a core for the inner channel. So far as form and function were concerned, they fulfilled claims and expectations up to a certain point, and the defects which thereafter developed were due, not to these elements themselves, but to the material employed in the handle construction, viz. cast steel. Under high pressure, and sometimes in the course of more ordinary employment, the handle would break, and the result would be loss, both of time and money.

Doughty, a foreman in the employ of Boyer, realizing the nature of the difficulty, believed that the substitution of drop-forged metal for cast steel or malleable iron castings in the making of the handle would solve the problem, and, pursuant to this belief, he put his theory into practice, so far as making a handle blank out of drop forgings, instead of malleable iron or cast steel, was concerned, plus the boring of a channel therein for the operation of the motive fluid. For this he secured his patent. In its original patented form, as above outlined, it was not available for use, and in order to adapt it for service it became necessary to take a step not included in or covered by his patent, viz. to heat the blank and bend it into the requisite shape.

This was done, and the result was to all intents and purposes the identical Boyer pistol grip handle, the only difference being in the material employed in construction (drop forgings, instead of malleable iron or cast steel), and the means employed for the inner duct or channel (a boring, instead of a core). In our opinion, the so-called invention of Doughty consisted of nothing more than a substitution of materials, and, while it can be freely conceded that the results secured in the Doughty handle are superior to those secured by Boyer through his cast steel manufacture, the superiority can be traced in its entirety to the employment of drop forgings as the constituent metal.

[1, 2] We fail to see wherein the employment of drop-forged, instead of cast, metals, can give the user the credit of inventive thought. The superior usefulness of drop-forged metals is a matter of common knowledge among all artisans who work in iron and steel, where breakage of cast metals is the evil sought to be cured, and Doughty simply adopted the expedient which would have occurred to any skillful craftsman under like circumstances. For it must be conceded by all that, if there be any invention whatever in the Doughty patent, it is in the substitution of metals, and while under some extraordinary circumstances the adoption of substitute materials has been accorded the credit and dignity of inventive thought, we are of the opinion that the instant case does not present circumstances which would bring it within the scope of such cases as those of Westmoreland Co. v. Hogan, 167 Fed. 327, 93 C. C. A. 31; Geo. Frost Co. et al. v. Cohn et al. (C. C.) 112 Fed. 1009, affirmed 119 Fed. 505, 56 C. C. A. 185; Low et al. v.

McMaster (C. C. A.) 266 Fed. 518. That portion of the decree of the court below holding this patent invalid for want of invention is affirmed.

Boyer Patent, No. 866,573, Claims 2, 3, 5, and 9, for a Rivet-Set Clip or Nose Clip.

These claims are combination claims, relating to a pneumatic hammer, a tool workable in connection therewith and termed a "rivet-set," and a spring clip so arranged as firmly, but loosely, to engage such tool. The first inquiry to be made regarding the inventive quality or value of the rivet-set clip is as to the need for such a clip. This leads us to examine the riveter itself, originally an invention of high order, and to the means employed in its operation.

In a riveting operation two tools are involved, one the riveter itself or the so-called gun. Through this mechanism is projected the power, but this mechanism in turn calls for the insertion within itself of another tool, similar to a die, as a die exists in the mechanism of other arts. This second tool is called a rivet-set, and is shaped at its end to conform to the character of the work proposed to be done. It is this tool which receives the initial blow from the piston of the hammer and transmits the blow to the rivet, and, being separate and distinct from the riveter or gun, must be so shaped as to be inserted in the riveter. Naturally, if this tool were simply inserted into the riveter, with no means provided for keeping it there, the powerful impact of the piston upon it while in operation would shoot it out of the riveter like a bullet. And on the other hand, if the means employed to connect these tools should join them firmly together, allowing no play whatever at the instant of impact, vibrations would be thereby greatly increased. Therefore that which the art demanded was a means whereby the riveter might be connected with the rivet-set tool in such fashion as to permit longitudinal movement of the tool with a minimun of vibration, and yet firmly enough to hold the tools together. This was the demand of the art, and the art at that time was practically limited to Boyer and his pneumatic riveter.

The next inquiry must therefore be as to what Boyer did to meet the demand, and whether or not invention was involved therein. He simply took a piece of elastic steel, shaped in the form of a clip with flanged edges, and made a groove toward the end of the riveter and a still wider groove in the side of the rivet-set. His next move was to spring the clip on the two metal parts and drop the flanges of the clip into the grooves provided for them. These grooves were sufficiently deep to permit the clip, elastic as it was, to stay in place, and the groove in the rivet-set was sufficiently broad to permit the rivet-set to move a very short distance longitudinally forward and backward. In short, this clip was a band of elastic steel, held in place by flanged edges, and snapping into prepared grooves in both tools, in such a way as to permit play of the rivet-set.

[3] Having in mind the very limited and very obvious demand of the art, it seems to us that there was no invention in supplying that demand as Boyer did. True, the clip was a simple contrivance and did

the work expected of it. True, also, is it that simple devices sometimes constitute invention of high order by reason of their very simplicity. In the present instance, however, we believe that Boyer did no more than any skilled mechanic, apprised of and confronted with the situation, could and would have done. The portion of the decision holding these claims invalid for want of invention is therefore affirmed.

### Boyer Patent, No. 917,242, Claim 24, for Exhaust Deflector.

[4] For the mechanism of the patent much is claimed, but as involving the quality of invention the value thereof must be measured by determining the need in the art served by such mechanism, or the demand made by the art for such aid as the mechanism was prepared to furnish. A survey of the art leads to the conclusion that it consisted mainly of the Boyer hammer. This hammer had a number of exhaust ports encircling the cylinder, out of which ports, unless controlled in some way, the exhaust would escape and fly in all directions. Carrying with it both moisture and grease, the result to the operator was annoying and unpleasant to a degree which made the adoption of some remedial means desirable. This situation describes both the need and demand of the art, so far as they existed. The need was not a great or vital one, nor had the art suffered in any such way for want of proper exhaust protection as to warrant an insistent demand for the help afforded by an exhaust deflector. What Boyer did was to make a clip somewhat upon the order of the nose clip heretofore described. This clip was made with flanges turned in, and these flanges fitted into corresponding grooves in the cylinder, placed above and below the circle of exhaust ports. In both the specification and claim the only result pointed out as attained was that the clip, being hollow and surrounding most of the exhaust ports, deflects the exhaust to that portion of the ports left uncovered, and, as set forth in both the specification and claim, "to the underside of the cylinder."

The patentee now claims, however, that the exhaust deflector is rotatably mounted over the exhaust passages, and that this placing constitutes "an adjustment feature," whereby the operator may slip the clip around the cylinder as he will, and thus cause the exhaust to escape in any direction chosen by him. While such an adjustment of a rotatably mounted exhaust deflector is not pointed out as a feature of the invention, it is undoubtedly true that the clip is rotatably mounted, and, if desired, may be adjusted to deflect the exhaust in any direction. But, even so, does this involve invention? Our thought in the first place is that there is no invention in carrying the exhaust to different parts of a mechanism. In an automobile people sit above much of the mechanism, and behind much of the mechanism—the portions wherein the explosions occur. The exhaust has to be provided for in some way, of course, and the automobile manufacturer does the natural and logical thing. He carries the exhaust to the rear of the machine, where nobody sits. There can surely be no invention involved in the simple carrying of the exhaust from an automobile engine to the rear of the vehicle. Neither do we see invention involved in carrying the exhaust of a pneumatic hammer "to the underside of the tool,"

as expressed in the specification and claims, nor is the situation improved and invention involved in placing a rotatable ring over a number of exhaust ports, in order that the exhaust may be deflected at will in any chosen direction. This deflector is, we believe, nothing more than a mechanical expedient, the conception of which is such as would occur to any skilled mechanic under the circumstances, and does not rise to the dignity of invention. That portion of the decree below, holding this claim invalid for want of invention, is affirmed.

### Claims 25, 26, and 27, for Locking Device.

[5] These claims are for a locking device, expressed in general terms, but certainly applicable to the Boyer pneumatic hammer. This device is used for the purpose of locking securely the handle and handle base or the cylinder head to the cylinder, in order to prevent such portions of the hammer thus joined from coming apart under the jar of the tool in operation. The diagram of the device is given in the patent, and it is not necessary to repeat here the description in the specification, which appears on page 4 thereof, beginning at line 54. That which we are dealing with here is a device to lock the cylinder to the cylinder head. On the front edge of the cylinder head there are teeth designed to intermesh with teeth set on the rear edge of a locking ring. The locking ring slips loosely over the cylinder, and a key prevents its rotation in relation to said cylinder. In relation to the cylinder head, the locking ring is held from rotation by engagement of the teeth. Over this is sprung a clip, which holds the locking ring and the cylinder head in intermeshed engagement; the locking ring being held by a key, the intermeshed means are thereby locked and held against disengagement. The key $M$ is a clever arrangement. Indeed, in itself it might involve invention, because its shape insures intermeshing of the teeth; but there is no claim for invention of the key, the claims covering the whole locking means, of which the key is but a part.

Such means, including a key, is found in principle in letters patent No. 689,073, issued to Ferguson, for a nut lock. In this Ferguson patent appears the same principle of intermeshing teeth—the same spring clip for holding the two parts, albeit differing in the number of grooves into which its turned-in edges are seated, and it includes a key. Between the Ferguson and Boyer locks there are differences, to be sure; but they are differences in detail, not in principle, and, few in number, consist mainly in differences naturally arising out of two separate problems; one, the locking of a nut, and the other, locking a cylinder to a cylinder head. With the Boyer problem in hand and the Ferguson patent available, we are satisfied that Boyer did nothing more than to adapt the Ferguson nut-locking device to the purposes of his own riveter, and equally are we satisfied that this adjustment or adaptation was one which would naturally occur to a skilled mechanic, and did not have to wait upon inventive conception. The portion of the decree holding these claims invalid for want of invention is likewise affirmed.

Meissner Patent, No. 822,146, Claims 37 and 38, for Valve Movement.

[6] These claims read as follows:

37. In a pneumatic hammer, a valve to control the admission and exhaust of motive fluid to and from the opposite ends of the cylinder, said valve being located at the rear end of the cylinder and in line therewith, and moved in one direction by air compressed by the piston and in the opposite direction by the motive fluid.

38. In a pneumatic hammer, a differential valve to control the admission and exhaust of motive fluid to and from the opposite ends of the cylinder, said valve being located at the rear end of the cylinder and in line therewith, and moved in one direction by motive fluid admitted to its larger pressure area at the forward stroke of the piston and in the opposite direction by air compressed by the piston at its return stroke, and acting against the smaller pressure area of the valve.

It is to be noted that claim 37 is not for the pneumatic hammer, which constitutes the working invention of Boyer, but for a valve controlling the admission and exhaust of motive fluid to and from opposite ends of the cylinder; the claims in controversy addressing themselves exclusively to the movement, not of the piston, but of the valve, and specifying nothing concerning the initiation of the stroke or the movement of the piston. The term "motive fluid" is a broad one, including air, steam, and other similar agencies, and as the admission of such fluids is generally governed by valves, and is applied alternately to opposite sides of a piston, cylindrically inclosed, it is manifest that we are here dealing with a well-known factor in the reciprocating art—a valve.

Examination discloses a specification, and therefore a limitation, which describes the Meissner valve, first, as being "located at the rear end of the cylinder;" second, as "in line therewith;" third, as "moved in one direction by air compressed by the piston;" and, fourth, as moved "in the opposite direction by the motive fluid." Now, assuming, in view of valve development, that such a claim could be granted, we next seek to discover as to whether or not the defendant embodies all these combined elements in its valve operation, noting that, inasmuch as infringement is a tort, the burden is laid upon the plaintiff of establishing such tort clearly through the weight of testimony.

Since it is apparent that defendant's valve is moved in one direction by live air, that being the same agency described in the fourth subdivision of the Meissner valve specification as "motive fluid," the identity of motive power is established as applying to both valves, so far as movement in one direction is concerned, and it therefore follows that the question of infringement must turn upon the point as to whether or not defendant's valve, like Meissner's, is moved in the opposite direction "by air compressed by the piston." It is to be remembered that it is the initial movement of the valve of which we are speaking, and all references thereto will be so understood, for, as hereafter noted, the initial movement of the Meissner piston, started by compressed air, and passing the live air admission port, thereby allowed the inlet of live air, and the completion of its forward stroke was accomplished through the utilization of such agency.

Infringement herein must lie, and be established, if at all, in proving the defendant's valve movement in one direction as operated by piston compressed air alone. In that connection we would first note that Meissner showed two separate and distinct valve moving agents; piston compressed air propelling in one direction, and motive fluid in the other. These two agencies neither co-operated nor mingled, one with the other, but operated alone in their respective domains. When the dominating power of one agent, through its functioning, had brought the valve to its forward journey's end, its work, for the time being, was completed, and thereupon the other agent became at once dominant, and moved the valve back to the starting point.

It was these separate and distinct valve-moving agents, assuming dominance and functioning alternately and successively, which produced the valve movement, and it was the valve movement to which the reciprocating piston movement, consisting of blow and retraction, in turn responded. Movement "in one direction by air compressed by the piston," as specified in the third analyzed element, being the portion of valve operation wherein any infringement must therefore lie, it necessarily follows that if the valve movement in such direction is effected, not alone by air compressed by the piston, but by the combined use of motive fluid and piston compressed air, we have a combination of functioning agents different from those defined and limited in the claim in controversy; and that the claim in question must be so interpreted and applied is apparent, not merely because the claim itself so reads, and no other type of valve construction is disclosed in the specification, but because the status and development of the valve art was such that the claim had to be confined to its own limitations in order to justify its grant. The fact may here be noted that, while there are 56 claims in this patent, the present charge of infringement is confined to 3 of them, from which it can be inferred that, while the defendant's tool may in some particular relating to the valve construction here involved duplicate the Meissner construction, in all other features it is not a reproduction of the Meissner hammer.

We now turn our inquiry to the ascertainment of such features of its valve construction as may show the defendant to have duplicated the Meissner valve. While, as stated in the thirty-seventh claim, the valve is one, the functional purpose of which is common to all valve types, namely, "to control the admission and exhaust of motive fluid to and from the opposite ends of the cylinder," yet later the claim defines and limits the particular valve offered by Meissner as being "located at the rear end of the [piston] cylinder and in line therewith," and also as being "moved in one direction by air compressed by the piston, and in the opposite direction by the motive fluid." It is this valve which constitutes the invention of this thirty-seventh claim, and the valve which Meissner in his specification says is "chief among the advantages of my hammer."

Taking up the feature of the valve first specified, namely, as being "located at the rear end of the [piston] cylinder and in line therewith," we find from the specification that the location is exactly as described, and a study thereof further reveals that no other possible location is suggested. In fact, such a valve, in order to work, must be so located

and aligned. Without entering into a detailed description of the working of Meissner's valve at this time, our present purpose is served in pointing out that his valve is piston cylinder inclosed and moves tandem with the piston. It is composed of two chambers separated by an imperforate wall, and it moves in one direction, together with the piston, under the power of compressed air, and in the opposite direction, also with the piston, under the power of live air. The reciprocating motion of the valve in each direction co-ordinates and is aligned with that of the piston. When the piston moves forward, the valve follows in the path left by the advancing piston, and in returning the piston moves in the path vacated by the valve. This tandem relationship and covered tandem path of valve and piston are, needless to say, the physical laws governing not only their movement, but also their separate and combined functions in delivering the blow. It will thus be seen that this tandem valve and piston alignment, the path of such alignment being cylindrically inclosed, is the only one disclosed, and is specifically claimed, and the monopoly of such a valve, through an awarded patent right, constitutes an adequate protection and reward to Meissner for the valve disclosure given by him to the public.

There was, therefore, every reason why the valve piston tandem alignment and motion and the valve location at the rear end of the cylinder should, for the sake of protection, and necessarily, for the sake of limitation, have been embodied in the claim, and the presence of these limitations, as set forth in the claim, prevents the court from emasculating such limitations by judicial construction, and thus blocking the advance of the art.

Now in the defendant's valve we have a different construction, and one that works not only on a different, but on an opposite, principle. Let us concede, for present purposes, that a valve, located abreast of the piston instead of tandemwise, and traveling forward and backward with it, might, in this respect, be said to constitute no departure from Meissner's disclosure, yet when the valve, as shown in defendant's structure, is not in tandem alignment with the piston, but moves in the opposite direction from the piston, and therefore in such opposing motive relationship that the two never could travel together tandem, we have here disclosed a type of valve differing essentially in principle from that of Meissner, undisclosed in his specification and uncovered in his claim. The defendant's valve moves forward when its piston moves backward, and vice versa, and this it does for the reason that it is not in line with the piston. If, then, the very law of its being is at variance with the requirements of the Meissner claim, on what rational ground can its freedom therefrom subject it to tribute under the claim?

Turning, now, from the elements of location and alignment to the valve motive elements of the claim, for, as already noted, the question is one of valve, not of piston, movement, the claim specifies that the valve be "moved in one direction by air compressed by the piston." This piston compressed air in the rear end of the cylinder is thus disclosed in the specification as the only motive power of the initial forward stroke:

"In operation, the piston upon its return stroke closes the port *63* of the passageway *62*. The air thus confined in the rear end of the cylinder is compressed to a higher degree than the normal or ordinary working pressure, and not only constitutes a positive cushion, but initiates the forward movement of the piston and drives it far enough to uncover the admission port *63*."

It is to be observed, also that in his claim and specification Meissner not only makes piston compressed air the sole motive power actuating the initial forward valve stroke, but he suggests no other motive power or any auxiliary power in connection with compressed air. The fact is that in the working of Meissner's valve on the forward stroke the live air supply is entirely shut off from access to the rear chamber, for the imperforate cross-section division of his valve makes two separate chambers, into one of which live air alone enters and by pressure against the imperforate partition actuates the valve in one direction, while compressed air alone fills the other chamber and actuates initially in the other direction.

Such being the only suggested mode of operation by Meissner, and the specified one of his claim, our next inquiry is concerning the operation of defendant's valve. This valve is a hollow, cylindrical one, surrounding the inner bore of the cylinder, and the piston moves inside of the valve. Contrasted with the piston valve tandem movement of Meissner's valve, it may be said of defendant's operation that piston and valve are abreast although moving in opposite directions. The movement of defendant's valve, in its box, is a limited, reciprocating one, and by such reciprocation it acts as a cut-off valve, by one movement admitting live air to the cylinder to drive the piston in one direction, and by its other movement admitting live air to the opposite cylinder end to drive it in the other direction.

In making this statement we are not unmindful of the fact that on the rearward stroke of the piston there is necessarily a compression of air in the rear chamber; but, notwithstanding this, our former statement remains true, namely, that defendant's valve, moving forward as the piston moves backward, admits live air to the rear chamber, while in Meissner's valve live air is shut off and excluded from the rear chamber. The amount of live air thus admitted, and its effect upon the valve movement, furnished the basis for a contest of experts and a wide diversity of opinion and speculation; but, without losing ourselves in that labyrinth of uncertainties, we return to the simple legal proposition that infringement is a tort, the burden of proving which rests upon him who charges it, and in this connection the simple fact confronts us that the admission of live air to defendant's rear chamber is clear; that such live air, venting itself in such chamber, is a factor in causing the entire forward stroke, and makes that forward stroke different from Meissner's, which is "moved in one direction by air compressed by the piston."

The compressed air in Meissner's chamber is necessarily the dominating feature, which vents its power in driving the piston forward; but, when defendant opens the compressed chamber and gives the air compressed therein an opening through which, unopposed, it could and would vent itself, but in fact does not, confronted, as it is, by live

air, possessing pressure sufficient to force its way into the chamber, it may well be contended that such live air, by overwhelming opposing force and entering the chamber thus becomes the dominant force in moving the valve forward. For surely it would seem that, if the live air did not dominate and become a super force, the compressed air would remain the dominant power, and, escaping through the vent opened by the valve, would make impossible the initiation of any forward stroke of the piston. In other words, given the three factors of compressed air, of entering live air, and resultant piston movement forward, such actual resultant movement proves that the live air has asserted its dominance as the real piston-moving factor. When the reciprocating strokes of the piston are analyzed into simple terms and thought, it will be seen that, as the live air, which the defendant admits for its backward stroke, serves to compress the air at the rear of its cylinder, it will follow that when, thus compressed, that live air is shut off from making the back stroke, and is turned in by the valve to co-operate with the compressed air in creating the forward stroke, the same live air serves and is the dominant factor in the making of both strokes, acting in conjunction with compressed air in both reciprocations. In the back stroke it lessens its own power by storing compression to create rebound, while in the forward stroke it increases its power by the supplemental compression.

Such seems to us to be the mode of operation of the defendant's valve: such the use it makes of compressed and live air; and, as we view it, this use, supplemented by the fact that the defendant's valve reciprocating movement is in a direction opposite to the piston's movement, and taken in connection with the other elements of differentiation, unite to make defendant's valve different from Meissner's. Had not the defendant, or some one else, evolved this valve, the public would not have known of it through any disclosure of Meissner's specification. In fact, Meissner would not have enjoyed a monopoly of such a valve during the life of his patent, nor upon the expiration thereof would the public have had a specification—disclosed knowledge—of such valve.

To construe Meissner's claims now as covering such a valve would manifestly serve to block, instead of promote, the mechanical advance for which patents exist. We are therefore of opinion that infringement of claims 37 and 38 has not been shown, and that such portion of the decree below as holds them infringed should be reversed.

Boyer Patent, No. 917,242, Claims 21 and 22, for Valve Movement.

[7] So far as these claims are concerned, we feel that there is comparatively little for us to add to our foregoing opinion touching the Meissner claims. Bearing in mind that the question here involved is one of valve movement and operation, and not of the reciprocating movements of the piston, it will be noted that, although the Boyer valve is so constructed as to permit the piston to pass through it, wherein it differs from the piston valve tandem arrangement of the Meissner operation, Boyer's claims call for the shifting of the valve "in one direction by air compressed by the piston," and "in the opposite direction by motive fluid * * * through the passage controlled by the pis-

ton," and in these vital features they largely duplicate the Meissner claims, thus making applicable the same reasoning and forcing the same conclusions as were reached by us in our discussion of said claims of Meissner regarding the nature of the motive power employed.

We fail to see invention in the hollow valve of Boyer, claims 21 and 22, believing that truth lies in the defendant's statement, that "solid valve imperforate to the piston, and hollow valve perforate to the piston, were equivalents to the art," as, for example, the Boyer patents of 1897–1899, and the patents cited, being those to Richards, Pickles, and Keller. If there was any value in the hollow valve, it could only prove so in its application to the mechanism of Boyer's riveter, because the hollow valve was known in other mechanical arts before Boyer. This being the case, there is no sound reason why there should be invention in applying a hollow valve to a riveter mechanism, merely to permit being done that which is done in all other mechanisms wherein the hollow valve plays a part; namely, to allow the piston to pass through it for the sake of a longer stroke and a correspondingly heavier blow. Had Boyer been the first person to have the concept of the hollow valve, his would surely have been a pioneer patent. No such claim is made for the hollow valve in this case. It is our opinion, therefore, that the portion of the decree below which holds Boyer's claims 21 and 22 infringed should be reversed.

### Meissner Patent No. 822,146, Claim 21, for Impinging.

[8] Concededly, a patent cannot be given for a function resulting from the operation of a mechanism, but for the creating mechanism only. Nevertheless, in order to establish invention and its contributing factors in the mechanism, the mechanism must be studied with regard to the claims made for it and the function which it performs within the scope of such claims.

[9] Therefore, the function studied under these conditions becomes important, for, while not patentable in itself, its workings will yet circumscribe the bounds of the patented mechanism producing it, so that a charge of infringement will not lie against one who, while mayhap using the identical mechanism, used it for a function altogether different from that contemplated and claimed in the patent. Under these conditions it becomes necessary to ascertain, if possible, the meaning which Meissner had in mind when he worded his claim No. 21.

In general terms he provides, first, for a riveting mechanism, and then applied to it the following descriptive language, designating it as having—

"a valve for controlling the admission and release of air, *and a duct leading from the air supply duct and opening in position and direction to cause the air to impinge against the valve in the general direction of its line of motion,* substantially as described."

This description shows an inlet of air, admitted for a specific purpose; this purpose being to act as a steadying agency, and thus prevent the quivering or fluttering of the valve. The duct having been introduced into one part of the mechanism, it performed its special function in serving to stabilize the action of another part of the same mechanism.

In short, the stabilization of the valve was the purpose of the invention and the actual reason for the introduction of the duct into the mechanism. In action it became the function of the invention. If there were no other question presented than to ascertain whether or not both the Meissner mechanism and the defendant's mechanism admit air against their respective valves through the medium of a duct, small difficulty would attend the task of solution, for both mechanisms, without any doubt, do contain this feature.

There are differences, however, in the two situations, which we hold to be controlling, and these primarily have to do with the functions performed through the admission of air against the respective valves by means of the duct. Both ducts have a common characteristic, in that they are small, and the fact that the defendant's duct does not occupy the same relative position in the mechanism as does the plaintiff's is not itself the vital difference. The real difference lies in the reasons for the admission of air against the valves of the two respective mechanisms, and the functions performed by such admitted air in the two cases.

As already shown, Meissner admits the air through his duct, in order that it may press or impinge against the sides of his valve and steady that which would otherwise be a fluttering movement. The defendant, on the other hand, does not depend upon the air admitted through his duct for the prevention of a flutter on the part of the valve, but uses it to move the valve forward, after his piston has completed its retrograde movement, in order to provide for the release and admission of the air necessary to shoot the piston forward again.

[10] In view of the foregoing, we are of the opinion that Meissner was not entitled to have his claim 21 interpreted so broadly as to extend the detail of a valve stabilizing agency in a hammer of the Meissner type to other valves as used in hammers of a different type. At most, this claim deals with the stabilizing of a valve motion through bringing more air to play upon its sides, and, granting that the use of such agency can be said to attain the level of invention, such monopolistic employment must nevertheless be confined to that particular type of valve alone in which Meissner showed its use. We are therefore of the opinion that such portion of the decree below as held claim 21 of patent No. 822,146 infringed should be reversed.

Unfortunately, both parties to this long and bitter controversy have indulged in methods and practices which should be, in the light of reflection, a source of deep regret to all who have participated therein, and the submission of this feature to us, with practically no argument, would seem to be mutely eloquent of a general conviction that the less said the better.

Upon the subject of equities involved, we are therefore of the opinion that the conclusions of the court below should be affirmed.